Affirmed as
Modified and Opinion filed August 26, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00082-CV

____________

 

WILLIAM G. WEST, CHAPTER 7 TRUSTEE
OF CLASSIC CONTRACTORS OF HOUSTON, LTD. AND CLASSIC GP, L.L.C., AND WESTERN SURETY COMPANY,
Appellant

 

V.

 

TRIPLE B SERVICES, LLP, Appellee

 



 

On Appeal from the 281st
District Court

Harris County, Texas

Trial Court Cause No. 2004-20457

 



 

O P I N I O N








In four issues, appellant William G. West, Chapter 7
Trustee of Classic Contractors of Houston, Ltd. and Classic GP, L.L.C., appeals
the trial court=s judgment in favor of appellee Triple B
Services, LLP (ATriple B@), the plaintiff
below, for damages arising out of Triple B=s contract with
the Classic entities (AClassic@) to construct a
lift station for a residential subdivision.  In two issues, appellant Western
Surety Company (AWestern@) appeals the
trial court=s judgment awarding judgment against it in a sum
greater than the face amount of the bond.  For the reasons explained below, we
affirm the trial court=s judgment as modified.

Factual
and Procedural Background

Classic owned an approximately sixty-acre tract of land in
the Kingwood area of Harris County, Texas, which it intended to develop as the
North Kingwood Forest subdivision.  The property, which had been annexed by the
City of Houston in 2000, was located within the boundaries of a tax increment
reinvestment zone (ATIRZ@), created by the
City of Houston, known as TIRZ No. 10.  Under the agreement between Classic and
TIRZ No. 10, Classic was to construct certain infrastructure improvements and,
after completion, the City of Houston would own these improvements.  The City,
in turn, would reimburse Classic=s costs to
construct the improvements.  

Part of the infrastructure to be completed was the
construction of water, sanitary sewer and drainage (AWS&D@) facilities. 
Another part of the infrastructure, and the part at issue here, was the
construction of a lift station.  A lift station is designed to collect outflow
from the sanitary sewer lines and lift the effluent so that gravity will cause
it to flow to a water treatment plant.  A lift station has three main
components:  a wet well, pumps and controls that monitor the level of fluid,
and landscaping and fencing. 

Classic hired the engineering firm of Carter & Burgess,
Inc. (AC&B@) to design the drawings
and plans for the WS&D facilities and the lift station.  After the drawings
were prepared by C&B, they were submitted to the City of Houston for
approval.  These plans, including the plans for the lift station, were approved
by the City of Houston.








C&B prepared the contract and served as Classic=s representative
and agent for the project.  The contract provided that the project was Adesigned by
[C&B] who is hereinafter called ENGINEER and who is to act as OWNER=S representative,
assume all duties and responsibilities and have the rights and authority
assigned to ENGINEER in the Contract Documents in connection with completion of
the Work in accordance with the Contract Documents.@  Collin Pier of
C&B was the project manager assigned to the project.  

Following a bidding process, Triple B was awarded the
contract for the construction of the WS&D facilities and the lift station. 
The contract provided that the WS&D work was to be substantially completed
within 90 days after the contract times commenced to run, and completed within
105 days.  The lift station work was to be substantially completed within 120
days and completed within 135 days.  The contract also specified that time was
of the essence, and provided for liquidated damages of $1,100 per day that the
work remained uncompleted.  

On August 5, 2002, C&B issued a Notice to Proceed to
Triple B, informing it that the contract times would commence running the next
day.  Later, when Triple B=s subcontractor, Peltier Brothers
Construction, Inc., tried to obtain a permit for the lift station construction,
the City refused to issue the permit.  The City contended that there were two
problems with the lift station.  First, it was being constructed on private
property, but the agreement between Classic and TIRZ No. 10 provided that the
lift station and the other improvements ultimately were to be owned and
operated by the City.  Second, the City had different and higher design and
building standards for lift stations that it was going to own and operate. 
Consequently, the City refused to issue a permit until the lift station
drawings were revised.  The City acknowledged that it had erroneously approved
the original plans for the lift station, explaining that when it approved the
plans, apparently it did not understand that it was going to own and operate
the lift station.  








Without a permit or approved plans for the lift station,
Triple B was unable to work on the lift station for some time.  After
discussions with Collin Pier about the changes that the City would require,
Triple B was able to determine the cost of the changes, and a revision of the
contract price for the changes was memorialized in Change Order No. 3.  Both
Triple B and Classic signed Change Order No. 3, which reflected an increase of
nearly $75,000 in the contract price.  No increase in the contract time was
included in the change order.[1] 
At C&B=s request, Triple B moved ahead with the installation
of the wet well portion of the lift station, and sunk the wet well in November
2002.  After various delays, Triple B substantially completed its work on the
lift station in November 2003.   

The City
eventually approved the construction drawings and issued a permit on May 14,
2003.  According to Pier, as the project progressed, everyone understood that
there was a delay caused by the City=s refusal to issue
a permit, and that the contract time did not run until the permit was issued.  

Periodically,
Triple B prepared pay estimates requesting payment as work progressed.  Triple
B submitted these pay estimates to C&B, which would review them and forward
them to Classic and TIRZ No. 10 with a recommendation that Classic pay Triple
B.  Pay Estimate No. 9, for Triple B=s work through May
31, 2003, reflected that Triple B was 922 days over the
contract time allowed for the completion of its work.[2] 
Classic nevertheless paid Triple B, just as it had paid all previous pay
requests.  In February 2004, C&B forwarded Pay Estimate No. 10,
recommending that Triple B be paid a final payment of $82,827.71, representing
the amount of the retainage.  Pay Estimate No. 10, like No. 9, also reflected
that Triple B was 922 days over the contract time allowed. 
However, this time, Classic refused to pay, questioning the number of days over
the allowed contract time.  








C&B then submitted a revised Pay Estimate No. 10, which
did not reflect any time exceeding the contract time.  C&B=s cover letter
explained that ATriple B Services completed the Water
Distribution, Sanitary Sewer, Storm Sewer Facilities and Lift Station within
the allocated contract times@ and elaborated on the reasons for the
delays.  In a second revision to Pay Estimate No. 10, C&B explained that
the original pay estimate request Awas inadvertently
approved for payment with a mistake in the project timeline.@  C&B also
repeated that Triple B had completed its work within the allocated contract
times, provided some additional reasons for the various delays, and again
recommended payment of the $82,827.71 in retainage.  Classic continued to
refuse to pay, and in response, Triple B filed an affidavit claiming a lien on
the property.

Shortly after filing the lien, Triple B sued Classic for
breach of contract, quantum meruit, and foreclosure on its lien.  Triple B
sought damages of $82,827.71, the amount of the unpaid retainage, attorney=s fees, and pre-
and post-judgment interest.  Classic then filed a release of lien bond that it
obtained from Western Surety.  The face amount of the bond was $124,241.56. 
Triple B amended its petition to add Western Surety as a defendant.  Classic
subsequently filed a counterclaim against Triple B for liquidated damages under
the contract.

With the parties= agreement, the
trial court ordered separate trials on Triple B=s and Classic=s claims.  In the
first trial, the court would determine whether Triple B was entitled to prevail
on its affirmative claims.  If the trial court found that Triple B breached the
contract, then the second trial would determine Classic=s damages.  

Following a two-day bench trial, the trial court signed
findings of fact and conclusions of law and awarded Triple B $82,827.71 in
actual damages against Classic and Western Surety, jointly and severally.  The
court also awarded Triple B attorney=s fees totaling
$98,500 pursuant to Chapter 53 of the Texas Property Code, pre- and
post-judgment interest, and court costs.  Western Surety subsequently paid to
Triple B the amount of the bond and three months= worth of
post-judgment interest in partial satisfaction of the judgment, reserving the
right to appeal the judgment as to any amounts in excess of the amount of the
bond.








On February 6, 2007, Classic was placed into an involuntary
bankruptcy proceeding.  An Order for Relief was subsequently entered on March
15, 2007, and William G. West was appointed as the Chapter 7 Trustee of
Classic.

Analysis
of Classic=s Issues

On appeal, Classic raises four issues:  (1) there is no
evidence or factually insufficient evidence that Triple B timely completed its
performance for construction of the lift station under the contract; (2) there
is no evidence or factually insufficient evidence to excuse Triple B from
complying with the contract provisions requiring it to timely apply for
extensions of time for completing its work; (3) there is no evidence or factually
insufficient evidence that Classic waived any terms of the contract, including
the requirement that Triple B achieve substantial and final completion of the
lift station with the contract time specified after the notice to proceed was
issued; and (4) the trial court erred in rendering judgment against Classic for
any attorney=s fees that exceeded the face amount of Western Surety=s bond. 

As explained below, our resolution of Classic=s first and second
issue disposes of the third issue, because we determine that the evidence was
legally and factually sufficient to support the trial court=s holding that
Classic was liable for breach of contract.  We do not reach the issue whether
the trial court=s award of attorney=s fees against
Classic under Chapter 53 was error, because we conclude that, alternatively,
the award is appropriate under Chapter 38 of the Civil Practice and Remedies
Code.  

I.        Classic=s Legal and Factual
Sufficiency Challenges

A.      The
Standard of Review and Applicable Law








Findings of fact in a bench trial have the same force and
dignity as a jury=s verdict upon questions and are reviewed
for legal and factual sufficiency of the evidence by the same standards.  Ortiz
v Jones, 917 S.W.2d 770, 772 (Tex. 1996); Anderson v. City of Seven
Points, 806 S.W.2d 791, 794 (Tex. 1991).  We review the trial court=s legal
conclusions de novo.  BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d
789, 794 (Tex. 2002).  

When reviewing the legal sufficiency of the evidence, we
review the evidence in the light most favorable to the challenged finding and
indulge every reasonable inference that would support it.  See City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable
evidence if a reasonable fact finder could, and disregard contrary evidence
unless a reasonable fact finder could not.  Id. at 827.  The evidence is
legally sufficient if it would enable a reasonable and fair-minded person to
reach the verdict under review.  Id.  There is Ano evidence@ or legally
insufficient evidence when (a) there is a complete absence of evidence of a
vital fact; (b) the court is barred by rules of law or evidence from giving
weight to the only evidence offered to prove a vital fact; (c) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (d) the
evidence conclusively establishes the opposite of the vital fact.  See id. at
810; Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997).  The fact finder is the sole judge of witness credibility and the weight
to give testimony.  See City of Keller, 168 S.W.3d at 819.

          When
reviewing a challenge to the factual sufficiency of the evidence, we examine
the entire record, considering both the evidence in favor of, and contrary to,
the challenged finding.  See Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986).  After considering and weighing all the evidence, we set aside the fact
finding only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust.  Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986).  In our review, we may not substitute our own judgment for
that of the trier of fact or pass upon the credibility of the witnesses.  See
Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998); GTE
Mobilnet of S. Tex. v. Pascouet, 61 S.W.3d 599, 615B16 (Tex. App.CHouston [14th
Dist.] 2001, pet. denied).  The amount of evidence necessary to affirm a
judgment is far less than that necessary to reverse a judgment.  Pascouet,
61 S.W.3d at 616.








To prevail on a breach of contract claim, a party must
establish the following elements:  (1) a valid contract existed between the
plaintiff and the defendant; (2) the plaintiff tendered performance or was
excused from doing so; (3) the defendant breached the terms of the contract;
and (4) the plaintiff sustained damages as a result of the defendant=s breach.  See
Valero Mktg. & Supply Co. v. Kalama Int=l, 51 S.W.3d 345,
351 (Tex. App.CHouston [1st Dist.] 2001, no pet.).  A breach occurs
when a party fails or refuses to do something he has promised to do.  Townewest
Homeowners Ass=n, Inc. v. Warner Commc=n Inc., 826 S.W.2d 638,
640 (Tex. App.CHouston [14th Dist.] 1992, no writ).  When one party
to a contract commits a material breach of that contract, the other party is
excused from further performance under the contract.  See Hernandez v. Gulf
Group Lloyds, 875 S.W.2d 691, 692 (Tex. 1994).

B.      The
Trial Court Did Not Err in Finding that Classic is Liable for Breach of
Contract

In its first and second issues, which it argues together,
Classic contends that the trial court erred in finding it liable for breach of
contract, because there is no evidence, or factually insufficient evidence,
that Triple B timely completed its performance under the contract or that
Triple B was excused from timely performing.  In response, Triple B contends
that Classic committed a prior breach of contract by requiring Triple B to work
with plans that were not approved or that lost prior approval, which prevented
Triple B from obtaining permits.  








Under the contract, Triple B was to substantially complete
the lift station within 120 days, and finally complete it within 135 days after
the work commenced.  According to Classic, it took Triple B approximately 2492 days to complete
the lift station (accounting for approved extensions), rather than the 135 days
called for in the contract.[3] 
The crux of Classic=s argument is that, under the General
Conditions that were incorporated into the contract, the contract times could
only be changed by a change order or a written amendment, and the lack of a
proper request for, and granting of, additional days is a condition precedent
to recovery which Triple B failed to satisfy.[4] 
Classic points to the evidence that, although Triple B had requested and
received approved extensions for other reasons, it never requested any
additional contract time to be added for any delays caused by the delay in
obtaining permits for the lift station, and Triple B=s own
documentation showed that it was 922 days over the
permitted contract time.








Classic further contends that Triple B=s actions are not
excused by the delay in obtaining a permit from the City of Houston based on
the plans Classic provided, because the delay did not prevent Triple B from
commencing the construction of the lift station, the plans were approved by the
City before Classic and Triple B entered into the contract, and Triple B did
not avail itself of the contractually mandated procedure for adjusting the
amount of contract time.  Consequently, Classic contends the trial court=s judgment should
be reversed and rendered that Triple B breached the contract, and the case
should be remanded for a trial to determine Classic=s damages,
including its claim under the liquidated damages provision of the contract for
at least $290,950.[5]








Triple B responds that the evidence is legally and
factually sufficient to show that Classic failed to provide it with approved
plans for the construction of the lift station so that Triple B could obtain a
building permit and know what to build.  Triple B contends that this was a
material breach of the contract, which prevented it from working on the lift
station.  Consequently, Triple B asserts, it was excused from performing under
the contract, and Classic, as the party in breach, may not contend that Triple
B violated the contract=s terms.         Under the contract,
Triple B, the contractor, was required to complete the lift station Aas specified or
indicated in the Contract Documents.@  Collin Pier, the
project manager for C&B, testified that Triple B=s performance
under the contract was conditioned on approval of the plans for the lift
station and the requisite permits.[6] 
The contract documents likewise reflect that the plans for the lift station
were incorporated into the contract.  In the contract, the list of  AContract Documents@ includes the AConstruction Plans
for Lift Station No. 1 to serve North Kingwood Forest.@  Additionally,
the General Conditions includes the specifications and drawings for the work in
the definition of AContract Documents.@[7]  Paragraph 3.3.2
of the Contract=s General Conditions governs errors and
discrepancies within the contract documents.  That section provides as follows:

If, during the performance of the
Work, CONTRACTOR discovers any conflict, error, ambiguity or discrepancy
within the Contract Documents or between the Contract Documents and any
provision of any such Law or Regulation applicable to the performance of the
Work or of any such standard, specification, manual or code or of any
instruction of any Supplier referred to in paragraph 6.5, CONTRACTOR shall report
it to ENGINEER in writing at once, and CONTRACTOR shall not proceed with the
Work affected thereby . . . until an amendment or supplement to the
Contract Documents has been issued by one of the methods indicated in paragraph
3.5 or 3.6 . . . .

(emphasis
added). 








Pier testified that a contractor like Triple B has to have
the City=s Public Works
Division approve the plans.  After that, the City=s Code Enforcement
Division must give the contractor permits to begin actual construction. 
C&B issued the Notice to Proceed to Triple B on August 5, 2002.  But, when
Triple B=s subcontractor
took the plans to the City of Houston to obtain a permit for the lift station,
the City refused to issue a permit because the property was not deeded to the
City and the plans were inadequate.  Without the required permits, Triple B was
unable to work on the lift station for several months.  Pier testified that the
problem was not Triple B=s fault.[8]

Pier also testified that approved plans for the lift
station were a prerequisite to issuing the Notice to Proceed.  He explained
that the counting of calendar days presumes that the contract for the lift
station has begun to run, and that Triple B is actually able to perform work on
the lift station.  Pier further testified that the computation of days presumes
that the Public Works & Engineering Department of the City has approved the
lift station plans and that Code Enforcement has actually issued a building
permit for the lift station.  Pier confirmed that none of these things
happened.

The importance of the plans was explained in the testimony
of Keith Burke, the managing partner of Triple B:

Q:      All right.  Was having approved plans an
important part of the contract in your mind?

A:      The plans
are our road map.  The road map we rely on to complete the journey out there. 
And without plans, clearly defining what it is that the owner wants, how am I
supposed to know what to build?

Similarly,
Pier testified that the plans were an important part of the contract documents
because they provide the information the contractor needs to construct the
project.








After discussions among C&B, Triple B, and the City,
the parties effectively agreed on and understood what modifications the City
would require.  The City indicated that construction could proceed, and C&B
directed Triple B to commence construction.  Eventually, the lift station was
completed, and on November 18, 2003, the City of Houston completed its final
inspection.  Pay estimates were submitted for payment to Triple B of the
retainage, and Classic refused to pay the amount of the retainage, $82,827.71.

Classic argues that Triple B=s delay is not
excused because Triple B never requested an extension of time for the delay in
obtaining permits even though it was obligated to do so under the contract.[9] 
Further, Classic points to the pay applications as demonstrating that Triple B
was able to work on the lift station before the permit was issued in May, 2003,
and the testimony of Pier and Burke that the lack of a permit did not prevent
the construction from occurring.  However, the evidence is sufficient to show
that Triple B=s performance under the contract was conditioned on
adequate and approved plans, but the plans were erroneously approved by the
City of Houston and so were inadequate at the time Classic and Triple B entered
into the contract.  The inadequate plans prevented Triple B and its
subcontractor from timely obtaining a permit to begin construction of the lift
station, which prevented Triple B from constructing the lift station at the
time the Notice to Proceed was issued.  Thus, the evidence is legally and
factually sufficient to enable the trial court to find that the lack of
adequate plans was a material breach of the contract by Classic.  








In an analogous case, Board of Regents of the University
of Texas v. S&G Construction Co., 529 S.W.2d 90 (Tex. Civ. App.CAustin 1975, writ
ref=d n.r.e.), the
court held that the owner=s inability to provide valid plans and
specifications constituted a prior material breach.  Id. at 96.  The
court observed that the owner=s conduct Awas a breach of
the contract resulting in the damage to appellee found by the jury.@  Id.; see
also Bd. of Regents of N. Tex. St. Univ. v. Denton Constr. Co., 652 S.W.2d 588,
590 (Tex. App.CFort Worth 1983, writ ref=d n.r.e.). 
Further, this Court has held that A[w]hen an owner
breaches a construction contract, it relinquishes its contractual procedural
rights concerning change orders and claims for additional costs.@  Shintech,
Inc. v. Group Constructors, Inc., 688 S.W.2d 144, 151 (Tex. App.CHouston [14th
Dist.] 1985, no writ).  

Classic attempts to distinguish Board of Regents of the
University of Texas v. S&G Construction Co. by arguing that, in this
case, the plans originally provided were not defective.[10] 
Classic points to Pier=s testimony that the plans were Aas close to
perfect as could be@ for the lift station, and that there were
no errors in the plans.  Further, the City of Houston had approved the plans,
and it was only after the contract was executed that the City Achanged its mind@ and required
modifications to the plans.  However, Pier testified that City of Houston
personnel informed him that the City had reviewed the drawings incorrectly
because it did not understand that the lift station was going to be owned and
operated by the City.  City of Houston personnel also told him that the plans
should not have been approved as designed.  Consequently, Pier opined that
Classic did not meet its obligations to Triple B under the contract, because it
did not provide a set of drawings from which a permit could be obtained.  Pier
also testified that, before there was even a signed contract, the plans were
not adequate for what the City ultimately required, and Classic should never
have issued the Notice to Proceed.








Thus, the evidence showed that the original plans did not
comply with the requirements for infrastructure improvements in a subdivision
development within a TIRZ, and for those reasons the plans were ultimately
determined to be inadequate and Triple B=s ability to
obtain the requisite permits was delayed.  Consequently, the evidence was
legally and factually sufficient to enable the trial court to find that Classic
committed a material breach of the contract that excused Triple B=s further
performance and forfeited Classic=s right to demand
that Triple B comply with the contract provisions concerning requests for
additional time.  And, it is undisputed that Classic refused to pay and did not
pay the remaining retainage due under the contract.

Therefore, under the facts of this case, we hold that the
evidence was legally and factually sufficient to support the trial court=s judgment in
favor of Triple B and against Classic.  We overrule Classic=s first three
issues.

C.      The
Trial Court Did Not Err in Rendering Judgment Against Classic for Attorney=s Fees in Excess of
the Face Amount of the Bond

In this issue, Classic challenges the trial court=s Conclusion of
Law No. 30, in which it concluded that Triple B was entitled to recover
reasonable attorney=s fees from Classic and Western Surety
Company under Chapter 53 of the Texas Property Code.  According to Classic, any
judgment against either it or Western Surety for an amount exceeding the face
amount of the bond is Anot supportable,@ and there is no
other finding that affords a basis for such an award.  We understand Classic=s contention to be
that, because the trial court determined that the sole basis for an award of
attorney=s fees against
Classic and Western Surety was under the bond issued pursuant to Chapter 53,
any recovery against them is limited to the face amount[11]
of the bond.  








However, we need not address Classic=s contention that
the trial court erred in awarding the full amount of attorney=s fees under
Chapter 53, because the record supports an alternative basis for awarding the
full amount of attorney=s fees against Classic.  Triple B=s petition
included a claim for breach of contract, and Triple B pleaded for attorney=s fees under both
Property Code section 53.156 and Civil Practice and Remedies Code section
38.001, which allows a party to recover reasonable attorney=s fees for a valid
claim on an oral or written contract.  See Tex. Civ. Prac. & Rem. Code ' 38.001(8). 
Further, in its findings of fact, the trial court found that Classic was liable
to Triple B for breach of contract and that Triple B Aincurred
reasonable attorney fees in the amount of $98,500 in prosecuting its claims
against Classic and Western Surety Company and in defending Classic=s counterclaim
through trial.@  Finally, the trial court concluded that Classic Ais obligated to
pay Triple B $82,827.71 as a result of Classic=s breach of the
Contract@ and so Ais ordered to pay
Triple B reasonable attorney fees in the amount of $98,500 in connection with
Triple B=s claims . . . .@[12]  Therefore, the
record supports the trial court=s judgment against Classic for attorney=s fees of $98,500
under Chapter 38 for Triple B=s breach of contract claim, separate from
the action on the bond.  See id. 

We therefore overrule Classic=s fourth issue. 

Analysis
of Western Surety=s Issues

Western Surety raises two issues on appeal:  (1) the trial
court erred by awarding judgment against it in an amount in excess of the face
amount of the bond; and (2) the trial court erred by making certain findings of
fact and conclusions of law, to the extent that they result in liability on the
part of Western Surety in excess of the penal sum of the bond, because, as a
matter of law, Western Surety=s liability is limited to the penal sum of
the bond.[13]   


I.        Error in
Awarding Judgment Against Western Surety in Excess of Face Amount of Bond








The amount of the bond Western Surety issued to Classic
under Chapter 53 was required to be in an amount that was one and one-half
times the amount of the lien.  See Tex.
Prop. Code ' 53.172(3) (providing that bond to
indemnify against lien exceeding $40,000 must be in an amount that is the
greater of 12 times the amount of the liens or the sum of $40,000
and the amount of the liens).  Western Surety complains that the amount of the
bond in this case was $124,241.56, but the judgment signed by the trial court
awarded damages, including attorney=s fees and
pre-judgment interest, against Classic and Western Surety jointly and severally
in the amount of $194,426.97, plus court costs and appellate attorney=s fees.  Western
Surety contends, based  on what it claims is well-settled law, that its
liability is capped by the face amount of the bond, regardless of the amount of
the judgment against its principal.  In response, Triple B contends that the
plain language of section 53.156 of the Property Code allows for an award of
reasonable attorney=s fees and costs in addition to actual
damages, and the law Western Surety relies upon does not apply to Chapter 53. 
Therefore, we will begin our analysis of this issue by examining the applicable
provisions of Chapter 53.[14] 


Section 53.156 of the Texas Property Code governs costs and
attorney=s fees in lawsuits
brought under Chapter 53.  That section provides:

In any proceeding to foreclose a
lien or to enforce a claim against a bond issued under Subchapter H, I, or J or
in any proceeding to declare that any lien or claim is invalid or unenforceable
in whole or in part, the court may award costs and reasonable attorney=s fees as are
equitable and just. 

Tex. Prop. Code ' 53.156 (footnote
omitted) (emphasis added).  Subchapter H to Chapter 53, which applies here,
governs bonds to indemnify against a lien.  Id. '' 53.171B53.175.  Section
53.172 provides that the bond must:








(1) describe the property on which the liens are claimed;

(2) refer to each lien claimed in a manner sufficient to identify it;

(3) be in an amount that is double the amount of the liens referred to
in the bond unless the total amount claimed in the liens exceeds $40,000, in
which case the bond must be in an amount that is the greater of 1 2 times the amount of the liens or
the sum of $40,000 and the amount of the liens;

(4) be payable to the parties claiming the liens;

(5) be executed by:

(A) the party filing the bond as principal;  and

(B) a corporate surety authorized and admitted to do
business under the law in this state and licensed by this state to execute the
bond as surety, subject to Section 1, Chapter 87, Acts of the 56th Legislature,
Regular Session, 1959 (Article 7.19‑1, Vernon=s Texas Insurance Code);  and

(6) be conditioned substantially
that the principal and sureties will pay to the named obligees or to their
assignees the amount that the named obligees would have been entitled to
recover if their claims had been proved to be valid and enforceable liens on
the property.

Id.. ' 53.172.








Section 53.156 is contained in subchapter G of Chapter 53. 
Subchapter G, entitled ARelease and Foreclosure; Action on Claim,@ addresses
generally proceedings involving releases and foreclosure actions on mechanic=s liens. 
Subsection H, which governs bonds to indemnify against such liens, prescribes
the specific amount of an indemnity bondCin this case,
one-and-one-half times the amount of the lien.  See id. ' 53.172(3). 
Although section 53.156 does plainly allow for the recovery of attorney=s fees  and costs
in an action to enforce a claim against a bond, nothing in its language
indicates a legislative intent to permit a recovery against a surety on an
indemnity bond exceeding the face amount of the bond.  That the Legislature
chose to provide for an additional amount above the amount of the lien
indicates that it intended the additional amount to be the extent of the surety=s liability for
any additional charges against it, which could include attorney=s fees or costs
under the bond.  If this were not the Legislature=s intent, it
simply could have provided that a surety would be liable for all attorney=s fees and costs,
and there would be no requirement for the additional one-half of the lien
amount.[15] 


Triple B=s argument would require us to conclude
that the Legislature intended section 53.156, a general provision of a separate
subchapter of Chapter 53, to override subchapter H=s specific
requirement that an indemnity bond be in a specified amount above the amount of
the lien, and to effectively invalidate this legislatively prescribed upper
limit on a party=s recovery under an indemnity bond.  We
decline to so conclude.  Cf. Colonial Am. Cas. & Surety Co., 214
S.W.3d at 733 (holding that surety which issued administrator=s bond could not
be liable for attorney=s fees in excess of face amount of bond,
even though Probate Code statute was amended to provide for attorney=s fees in actions
against administrators of estates, because there was Ano indication the
legislature sought to override the general rule that a surety cannot be held
liable beyond the express terms of its undertaking@).   








Moreover, Triple B=s argument would
directly conflict with the well-settled rule that a surety=s liability
generally is limited to the face amount of the bond.  See Great Am.
Ins. Co. v. N. Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415, 426 (Tex.
1995).  This rule has been applied in a variety of contexts.  See, e.g.,
id. at 426B27 (performance bond); Abercia v.
Kingvision Pay-Per-View, Ltd., 217 S.W.3d 688, 704B705 (Tex. App.CEl Paso 2007, pet.
denied) (constable=s bond); Colonial Am. Casualty &
Surety Co., 214 S.W.3d at 734 (estate administrator=s bond); Ferguson
v. Ferguson, 69 S.W.2d 592, 595 (Tex. Civ. App.CEastland 1934, no
writ) (supersedeas bond); First Nat=l Bank of
Brownfield v. Mass. Bonding & Ins. Co., 69 S.W.2d 151, 152B53 (Tex. Civ. App.CAmarillo 1934,
writ ref=d) (warehouseman=s bond); Chesley
v. Reinhardt, 300 S.W. 973, 974 (Tex. Civ. App.CEl Paso 1927, no
writ) (bond in favor of insurance companies); Locke v. Beal, 257 S.W.
302, 302 (Tex. Civ. App.CGalveston 1923, no writ) (forcible entry
and detainer bond).  Apparently, no case to date has applied the general rule
specifically to Property Code section 53.156.  Triple B attempts to distinguish
such cases by noting that they either pre-date Chapter 53 or do not involve
section 53.156 specifically. But, Triple B offers no compelling reason why the
indemnity bond at issue should be treated differently than the many other types
of bonds to which the rule has been applied. 

Triple B also argues that Chapter 53 trumps the common law,
and because there is a conflict between Chapter 53 and the common law, Chapter
53 must control.  See Signal Oil & Gas Co. v. Universal Oil Prods.,
572 S.W.2d 320, 330 (Tex. 1978) (AWhere the
[Business and Commerce] Code is not in conflict with the prior common law of
warranty, such law supplements the basic provisions of the Code.@); Bartley v.
Guillot, 990 S.W.2d 481, 485 (Tex. App.CHouston [14th
Dist.] 1999, pet. denied) (AWhere the common law is revised by
statute, the statute controls.@).  However, as we have explained, we
disagree that section 53.156 plainly allows a recovery above the legislatively
prescribed upper limit of an indemnity bond, and so we find no conflict between
the statute and the general common-law rule.








Triple B further argues that we cannot look beyond the text
of the statuteCwhich it contends plainly permits awards of attorney=s fees above the
face amount of the bondCto speculate as to the Legislature=s intent in
enacting a statute.  See McIntyre v. Ramirez, 109 S.W.3d 741, 748 (Tex.
2003) (noting that court=s role in interpreting Good Samaritan
statute was Anot to second-guess the policy choices that inform our
statutes or to weigh the effectiveness of their results; rather, our task is to
interpret those statutes in a manner that effectuates the Legislature=s intent@); Fitzgerald
v. Advanced Spine Fixation Sys., Inc., 996 S.W.2d 864, 868 (Tex. 1999) (AThe Legislature=s goal in crafting
[the indemnity provision contained in the Texas Products Liability Act of 1993]
cannot be known except as revealed in its text.@).  Triple B
posits that if the Legislature intended section 53.156 to limit the recovery of
attorney=s fees to the face
amount of the bond, it could have done so expressly, as it did in section
86.002 of the Texas Local Government Code.  Section 86.002 provides that a
constable=s bond is set by the commissioner=s court Ain an amount of
not less than $500 or more than $1,500.@ Tex. Loc. Gov=t Code ' 86.002(a)
(emphasis added).  But, as we have pointed out, Subchapter H also prescribes
the upper limit of the indemnity bond at issue here.  Thus, Triple B=s argument is
actually undercut by its reference to the constable=s bond statute.

Triple B also points to Texas Transportation Code section
503.033, which provides for the recovery of attorney=s fees in addition
to damages against a surety, but expressly limits the surety=s liability by
providing that it Amay not exceed the face value of the
surety bond.@  See Tex.
Transp. Code ' 503.033(e)B(f).  In the same
section, this statute also requires that the amount of the bond be $25,000.  Id.
' 503.033(a). 
Because the amount of the bond is fixed, attorney=s fees are
provided for, and the surety=s liability is limited to the amount of
the bond all in the same section, Transportation Code section 503.033 leaves no
ambiguity concerning the Legislature=s intent. 
However, for the reasons previously stated, we cannot conclude from this
example that the Legislature intended something different when it enacted
Property Code section 53.156.  Moreover, we note that the express language of
Transportation Code section 503.033 merely restates and applies the general
rule concerning the limits on a surety=s liability, which
would be consistent with our construction of Property Code section 53.156.








Finally, Triple B argues that the interpretation of Chapter
53 proposed by Western Surety would lead to an absurd result, because it would
enable a surety to limit its potential liability to the difference between
actual damages and the face amount of the bond.  Triple B contends that,
because costs and attorney=s fees can often exceed the difference
between the face value of the bond and actual damages, public policy weighs
against such a result because it would be neither equitable nor just.  See Tex. Prop. Code ' 53.156 (providing
trial court may award reasonable attorney=s fees Aas are equitable
and just@).  We acknowledge
that limiting the recovery of costs and attorney=s fees to the face
amount of the bond could limit a contractor=s potential
recovery of costs and attorney=s fees, but that is always a potential
outcome when a party sues on a bond, unless there is some other statutory or
contractual basis for a full recovery of costs and attorney=s fees against the
surety.  Although Triple B perceives an unfairness in the result, it points to
nothing that renders the result in this case any more Aabsurd@ than the result
reached in the weight of the authorities upholding the general rule limiting a
surety=s liability to the
face amount of the bond.

Therefore, in the absence of any express language to the
contrary, we hold that the Legislature did not intend Property Code section
53.156 to alter the general rule that the surety=s liability is
limited to the face amount of the bond.  We sustain Western Surety=s first issue.

II.       The Trial
Court=s Findings of Fact and Conclusions of Law

In its second issue, Western Surety attacks certain
findings of fact and conclusions of law to the extent that they result in
liability on its part in excess of the face amount of the bond, because,
according to Western Surety, as a matter of law its liability is limited to the
face amount of the bond.  

A.      Findings
of Fact

Finding of Fact No. 108.  Western Surety contends that the
trial court erred in finding that it is liable to Triple B for Aany and all
amounts that Classic is liable to Triple B under the statutory and
constitutional liens.@  As explained above, we agree that
Western has no liability to Triple B under the bond in excess of the face
amount of the bond.

Finding of Fact No. 109.  Western Surety contends that the
trial court erred in finding that AClassic and
Western Surety Company have each failed to pay any part of the $82,827.71 to
which Triple B is entitled under the lien or constitutional lien,@ because Western=s liability does
not arise until such time that a judgment against Classic becomes final and
Classic does not pay such judgment.  This argument appears to be based on a
condition of the bond that provides as follows:  








if the above bounden, Classic
Contractors of Houston, Ltd. shall well and truly pay any and all judgments
which may be rendered against the said property in favor of the aforesaid
lienor, his successors or assigns, in any action or proceeding to enforce said
lien, then this obligation shall be void, otherwise to remain in full force and
effect.@

However,
Western Surety=s brief contains no argument, analysis, or legal
authorities to support its assertion.  Therefore, because it is inadequately
briefed, we overrule this sub-issue.  See Tex. R. App. P. 38.1(h); San Saba Energy, L.P. v. Crawford,
171 S.W.3d 323, 337B38 (Tex. App.CHouston [14th
Dist.] 2005, no pet.).

Finding of Fact No. 115.  Western Surety contends that the
trial court erred in finding that A[a]ll conditions
precedent to Triple B=s claims an suit have occurred or been
performed or satisfied, if not excused,@ to the extent it
implies that Western=s liability under the bond had arisen at
the time of judgment and to the extent that it implies that Western might be
liable for sums in excess of the penal sum of the bond.  Although we have
determined that Western Surety is not liable for any sums in excess of the face
amount of the bond, we overrule the contention in this sub-issue that Western
Surety=s liability had
not arisen at the time of judgment as inadequately briefed.

Finding of Fact Nos. 119B122.  Western Surety
complains that the trial court erred in making these findings of fact because
suit against it was premature until such time that a final, non-appealable
judgment is rendered against Classic and not thereafter paid by Classic:

No. 119:  ATriple B has incurred attorneys= fees in connection with the
prosecution of its claim against Classic and Western Surety Company and in
connection with Classic=s counterclaim against Triple B.@

No. 120:  AAttorneys fees incurred in
prosecuting Triple B=s claim against Classic and Western
Surety Company are inextricably intertwined with those incurred in defending
Classic=s counterclaim against Triple B.

No. 121:  ATriple B incurred reasonable
attorney fees in the amount of $98,500.00 in prosecuting its claims against
Classic and Western Surety Company and in defending Classic=s counterclaim through trial.@

No. 122:  Triple B will incur
additional attorneys= fees of $20,000.00 in the event of an
appeal to the court of appeals, $10,000.00 in the event of a petition to the
Texas Supreme Court that is not granted and $10,000.00 more if the petition is
granted but unsuccessful.@








According
to Western Surety, there was no need to file a claim against it and it had no
liability under the bond at the time it was sued; therefore, any attorney=s fees incurred by
Triple B were not in connection with its claim against Western Surety, but
rather, its claims against Classic.

Again, although we have determined that Western Surety is
not liable for any sums in excess of the face amount of the bond, we overrule
the contention in this sub-issue that Western Surety=s liability had
not arisen at the time of judgment as inadequately briefed.

Finding of Fact Nos. 123B24.  Western Surety
contends the trial court erred in finding that ATriple B has
proven by a preponderance of the evidence and prevails on all its causes of
action[], defenses and affirmative defenses against Classic, Classic GP, LLC,
and Western Surety Company,@ and AClassic, Classic
GP, LLC and Western Surety Company failed to prove by a preponderance of the
evidence any of its causes of action, defenses and affirmative defenses against
Triple B.@

Western Surety complains of these findings of fact to the
extent that (1) they imply that its liability under the bond arose at the time
of judgment, (2) Western might be liable for sums in excess of the face amount
of the bond, and (3) they imply that Western breached the condition of its
bond, or is liable to Triple B under a breach of contract theory.  Western
Surety further asserts that, as a matter of law, the condition of the bond was
such that its liability does not arise until a final judgment is rendered
against Classic which is not paid by Classic.  Again, although we have
determined that Western Surety is not liable for any sums in excess of the face
amount of the bond (in response to (2) above), we overrule Western Surety=s additional
contentions as inadequately briefed.

B.      Conclusions
of Law

Western Surety raises similar complaints concerning the
following conclusions of law Ain an abundance of caution@:

No. 4:  AWestern Surety Company is obligated
to pay Triple B $82,827.71, plus attorneys fees under the Bond.@








No. 29:  AClassic is ordered to pay Triple B
reasonable attorney fees in the amount of $$98,500.00 in connection with Triple
B=s claims against Classic and
Western Surety Company and in defending Classic=s counterclaim through trial.@

No. 30:  ATriple B is entitled to recover
reasonable attorney fees from Classic and Western Surety Company under Chapter
53 of the Texas Property Code.@

No. 38:  AClassic and Western Surety Company
are jointly and severally liable to Triple B under the Bond in the amount of
$82,827.11, plus reasonable attorney=s fees and interest.@

No. 39:  ATriple B is
entitled to prejudgment interest to the maximum amount allowed by law.@

We agree with Western Surety that these conclusions of law
provide that Western Surety is liable to Triple B for costs and attorney=s fees in an
amount in excess of the face amount of the bond, whether individually or
jointly and severally with Classic.  We overrule all other contentions as
inadequately briefed.

Accordingly, we sustain Western Surety=s second issue to
the extent that the trial court=s findings of fact and conclusions of law
identified above imply that Western Surety is liable for any costs or attorney=s fees under
Property Code section 53.156 in excess of the face amount of the bond, whether
individually or jointly and severally with Classic.  However, we overrule
Western Surety=s other arguments as inadequately briefed.

Conclusion








We hold that the evidence is legally and factually
sufficient to support the trial court=s findings that
Classic breached its contract with Triple B, and so we overrule Classic=s first two issues
and do not reach its third issue.  We also do not reach Classic=s fourth issue
concerning whether the trial court=s award of
attorney=s fees against
Classic under Chapter 53 was error, because we conclude that, alternatively,
the award is appropriate under Chapter 38 of the Civil Practice and Remedies
Code.  We also sustain Western Surety=s two issues to
the extent that the trial court=s judgment ordered that Western Surety was
liable for any amounts above $124,241.56, the face amount of the bond it issued
to Classic.  We therefore modify the trial court=s judgment to
limit Western Surety=s liability to $124,241.56, and affirm the
judgment as modified.

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

Judgment rendered
and Opinion filed August 26, 2008.

Panel consists of
Chief Justice Hedges and Justices Fowler and Boyce.

 

 

 









[1]  Triple B=s
Exhibit 21 included a letter, dated January 16, 2003, from Stacy Kelly of
Triple B to Collin Pier, enclosing a cost breakdown relating to Change Order
No.3 and requesting Aone hundred calendar days be added to our contract.@  Keith Burke of Triple B testified that the letter
was faxed to Pier.  However, Pier testified that he did not recall receiving
the letter, and so did not respond to it.





[2]  Keith Burke of Triple B testified that the number of
days over contract time was automatically generated on the document by the
company=s computer software.





[3]  In connection with this argument, Classic states
that completion of the contract within the required time was a condition
precedent to any recovery by Triple B that was not satisfied; further, Classic
points out that the parties specifically agreed in the contract that Atime is of the essence.@





[4]  Article 12 of the General Conditions, on which Classic
relies, provides in relevant part:

 

12.1.  The Contract Times (or Milestones) may only be
changed by a Change Order or a Written Amendment.  Any claim for an adjustment
of the Contract Times (or Milestones) shall be based on written notice
delivered by the party making the claim to the other party and to ENGINEER
promptly (but in no event later than thirty days) after the occurrence of the
event giving rise to the claim and stating the general nature of the claim. . .
. No claim for an adjustment in the Contract Times (or Milestones) will be
valid if not submitted in accordance with the requirements of this paragraph
12.1

 

12.2.  All time limits stated in the Contract
Documents are of the essence of the Agreement.

 

12.3  Where CONTRACTOR is prevented from completing
any part of the Work within the Contract Times (or Milestones) due to delay
beyond the control of the CONTRACTOR, the Contract Times (or Milestones) will
be extended in an amount equal to the time lost due to such delay if a claim is
made therefore as provided in paragraph 12.1. 





[5]  In connection with its first two issues, Classic
contends, in a blanket fashion, that there is no evidence, or factually
insufficient evidence, to support Finding of Fact Nos. 18B22, 24B25, 27, 30, 33,
35B43, 46B48, 51, 59B60, 67, 69, 71, 76B77,
79B80, 89B91, 104B105, 109B15,
123B24, and to the extent they constitute findings of
fact, Conclusions of Law 1B3, 5B7, 11B22, 26B28, 31B37.  However,
Classic separately challenges the trial court=s Conclusion of Law No. 26, in which the court stated as follows:  AAll provisions in the Contract requiring Triple B to
give Classic notice of a claim for damages, delays or an occurrence giving rise
to damages or delays, including requests for contract time extensions, within
less than 90 days is void under Tex. Civ. Prac. & Rem. Code ' 16.071.@ 
Section 16.071 provides:  AA contract
stipulation that requires a claimant to give notice of a claim for damages as a
condition precedent to the right to sue on the contract is not valid unless the
stipulation is reasonable.  A stipulation that requires notification within
less than 90 days is void.@  Tex. Civ. Prac. & Rem. Code ' 16.071(a).  Classic contends that section 16.071 does
not apply to the contract because contracts obligating parties to pay in excess
of $500,000 are excluded from the notice requirements.  See' 16.071(f).  Triple B responds that subsection 
16.071(f) only applies to Aa contract
relating to the sale or purchase of a business entity.@  See id.  We agree with Triple B that the
plain language of section 16.071(f) does not provide an exception that applies
in this case.  We express no opinion concerning the applicability of section
16.071 to the contract beyond the parties=
arguments.





[6]  Additionally, Classic does not challenge the trial
court=s Finding of Fact No. 17, which provides as follows:  AClassic=s
issuance of Notice to Proceed was based and conditioned upon Classic providing
Triple B with all of the documentation and information required under the
Contract and the contract documents, including construction plans for the
WS&D and the Lift Station that were approved by the City and all other
required governmental entities.@





[7]  Article 1.10 of the General Conditions provided as
follows:

 

Contract
DocumentsCthe Agreement, Addenda (which pertain to the Contract
Documents), CONTRACTOR=s Bid (including documentation accompanying the Bid
and any post Bid documentation submitted prior to the Notice of Award) when
attached as an exhibit to the Agreement, the Notice to Proceed, the Bonds,
these General Conditions, the Supplementary Conditions, the Specifications and
the Drawings as the same are more specifically identified in the Agreement,
together with all Written Amendments, Change Orders, Work Change Directives,
Field Orders and ENGINEER=s written interpretations and clarifications issued
pursuant to paragraphs 3.5, 3.6, and 3.6.3 on or after the Effective Date of
the Agreement. . . .  





[8]  In its
appellate brief, Classic also concedes that A[i]t is
unquestionably true that the action of the City of Houston Code Enforcement
Department, in refusing to issue a permit on plans previously approved by the
Public Works Department, was an occurrence of an event that was beyond the
control of Triple B.@  





[9]  To support its claim that the failure to follow a
contractually mandated procedure for securing extra time is fatal to Triple B=s breach of contract claim, Classic cites City of Houston v. R.F. Ball
Construction Co.,
570 S.W.2d 75 (Tex. Civ. App.CHouston [14th Dist.] 1978, writ ref=d n.r.e.).  That case is distinguishable because, in that
case, the court held that a Ano damages for delay@ clause in the contract between the city and the contractor prevented
the contractor from recovering damages for delays caused by city that were
within the scope of the clause.  See
id. at 77B78.





[10]  Classic does not dispute that, as a matter of law,
the contract imposed upon it the obligation to provide correct and adequate
plans and specifications for the lift station.  Further, Classic does not
challenge the trial court=s Finding of Fact No. 44, which provides as follows:  AClassic had a duty under the Contract to provide
Triple B with approved construction plans for the Lift Station so as to allow
Triple [B] to secure a construction permit for construction of the Lift Station
and, more importantly, provide it with instructions on what to build.  This
duty was a condition precedent to Triple B=s
performance under the Contract.@





[11]  Case law and statutes sometimes refer to the Apenalty@ of
the bond or the Apenal sum@ of
the bond, which is another way of referring to the face amount of the bond.  See
Colonial Am. Cas. & Surety Co. v. Scherer, 214 S.W.3d 725, 730 n.3
(Tex. App.CAustin 2007, no pet.).





[12]  The trial court also found, consistent with the
procedures for recovery of attorney=s
fees under Texas Civil Practice and Remedies Code Chapter 38, that (1) Triple B
was represented by any attorney in this matter, (2) on or about April 13, 2004,
Triple B presented its $82,827.71 claim to Classic for payment, and (3) Classic
failed to pay Triple B $82,827.71 within 30 days of Triple B=s presentment of its claim.  See Tex. Civ. Prac. & Rem. Code ' 38.002.  Classic does not challenge these findings of
fact.





[13]  The challenged Findings of Fact are Nos. 108B109, 115, 119, 120, and 121B24.  The challenged Conclusions of Law are 4, 29B30, and 38B39.





[14]  Statutory construction is a legal question that we review de novo,
ascertaining and giving effect to the Legislature=s intent as expressed by the plain and common
meaning of the statute=s words.  F.F.P. Operating
Partners, L.P. v. Duenez, 237 S.W.3d 680, 683 (Tex. 2007).  In construing a
statute, our primary objective is to determine the Legislature=s intent, which, when possible, we
discern from the plain meaning of the words chosen.  State v. Shumake,
199 S.W.3d 279, 284 (Tex. 2006); see also State v. Silver Chevrolet Pickup,
140 S.W.3d 691, 693 (Tex. 2004) (per curiam) (on review of civil forfeiture
proceeding under Texas Code of Criminal Procedure Chapter 59, stating that the Amost important rule of statutory
construction@ is Athat the court must give effect to legislative
intent@ and the principle that forfeitures
are strictly construed does not prevent a court from considering the purpose of
a statutory provision).  We presume that every word of a statute was used for a
purpose, and, likewise, that every word excluded was excluded for a purpose.  Cameron
v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981).  We must
consider the statute as a whole rather than its isolated provisions.  Helena
Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001); Cont=l Cas. Ins. Co. v. Functional
Restoration Assocs.,
19 S.W.3d 393, 398 (Tex. 2000). 





[15]  For the same reasons, we do not consider the
language of section
53.172(6), requiring that the bond be conditioned substantially that the
principal and sureties will pay the Aamount that the named obligees would have been entitled to
recover if their claims had been proved to be valid and enforceable liens on
the property@ a persuasive basis on which to
conclude that the Legislature intended to override the limit on the amount of
the bond.  See Tex. Prop. Code
' 53.172(6).